IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

```
AMERICAN HOME ASSURANCE     )
COMPANY and CARGILL MEAT    )
SOLUTIONS CORPORATION,      )
                            )
            Plaintiffs,     )         8:11CV270
                            )
      v.                    )
                            )
GREATER OMAHA PACKING COMPANY,)       MEMORANDUM AND ORDER
INC.,                       )
                            )
            Defendant.      )
_____)
```

This matter is before the Court on the *Daubert* motion of plaintiff Cargill to exclude proposed expert testimony and reports of Dr. Michael Thomsen (Filing No. 216). Cargill filed a supporting brief and index of evidence (Filing No. 217 and Filing No. 218). The defendant filed a responsive brief and indices of evidence in opposition to the motion (Filing Nos. 319 and 320, 321 and 322). Cargill filed a responsive brief (Filing No. 319) and indices of evidence (Filing Nos. 320, 321, 322 and 323). The motion will be denied.

I.   **BACKGROUND**

An *E. coli* outbreak occurred in 2007 which gravely injured several people. An investigation traced the *E. coli* back to a ground-beef patty manufacturer, Cargill Meat Solutions, Corp. ("Cargill"), who is the plaintiff in this case along with

American Home Assurance Company ("Assurance").  The plaintiffs have brought various contract claims against the defendant, Greater Omaha Packing, Co. ("GOPAC").  Essentially, the plaintiffs claim that GOPAC sold Cargill meat contaminated with the *E. coli* strain in violation of a contract between GOPAC and Cargill.  GOPAC denies all claims and asserts a counterclaim against the plaintiffs for the tortious interference with business relationships and expectancies (hereinafter "Tortious Interference").  Filing No. 40, at 8.

The impetus for GOPAC's counterclaim is an article in which an attorney retained by Cargill allegedly commented on aspects of this case to a reporter before it was filed.  Cargill had retained Shawn Stevens, attorney at Gass, Weber, & Mullins, to defend Cargill from claims brought by those injured by the *E. coli* outbreak (Filing No. 220, at ¶22).  In the course of Mr. Stevens's work with Cargill, Mr. Stevens discovered facts which led Cargill to assert claims against GOPAC and file this current claim against it.  In late March 2009, *New York Times* reporter, Michael Moss, first spoke to Mr. Stevens on the phone.  The two men spoke five times.  According to Mr. Stevens, the conversations were initially innocuous and generalized regarding how one performs traceback investigations in *E. coli* outbreaks; however, Mr. Moss garnered additional facts underlying the 2007

-2-

Cargill recall and began to ask Mr. Stevens more pointed questions. At that point, Mr. Stevens refused to answer additional questions and ended the conversations.

On October 3, 2009, Mr. Moss published a ten-page, Pulitzer-prize winning story regarding the *E. coli* outbreak, "The Burger That Shattered Her Life" (Filing No. 210-1, at 1-10). In salient part, the *New York Times* article (hereinafter "the Article") read as follows:

> Shawn K. Stevens, a lawyer in Milwaukee working for Cargill, began investigating. Sifting through state health department records from around the nation, Mr. Stevens found the case of young girl in Hawaii stricken with the same E. coli found in the Cargill patties. But instead of a Cargill burger, she had eaten raw minced beef at a Japanese restaurant that Mr. Stevens said he traced through a distributor to Greater Omaha.
>
> "Potentially, it could let Cargill shift all the responsibility," Mr. Stevens said. In March, he sent his findings to William Marler, a lawyer in Seattle who specializes in food-borne disease cases and is handling the claims against Cargill.
>
> "Most of the time, in these outbreaks, it's not unusual when I point the finger at somebody they try to point the finger at somebody else," Mr. Marler said. But he said Mr. Stevens's finding "doesn't

> rise to the level of proof that I need" to sue Greater Omaha.
>
> It is unclear whether Cargill presented the Hawaii findings to Greater Omaha, since neither company would comment on the matter.

Filing No. 210-1, at 9.  It is important to note that GOPAC's claims do not focus on whether the Article itself was the cause of damages.  Rather, GOPAC asserts the statements Mr. Stevens made to Mr. Moss were disseminated to GOPAC's clientele during Mr. Moss's investigation of the Article and thereby caused damages (*See* Filing No. 40, at ¶17-21).

In order to determine whether GOPAC experienced damages related to the Article or the statements Mr. Stevens made to Mr. Moss, GOPAC commissioned an event study.  An "event study" determines whether a causal connection exists between correlated events; for example:  whether the publication of an investigatory news article caused a depreciation in sales prices.  The "event" of Dr. Thomsen's study was October 3, 2009, the publication date of the Article.  The study's "event window," the period of time Dr. Thomsen studied surrounding the "event," was from August 14,

2009[1] until December 28, 2009.  In order to create a basis of comparison for GOPAC's sales prices and prices of the broader beef market, Dr. Thomsen focused on "boxed-beef cutout values" (Filing No. 217, 34).

When comparing the national average price for beef and the price GOPAC sold beef during the event window, Dr. Thomsen observed a lower sales price for GOPAC meat.  The decrease in sales price for GOPAC's meat began August 31, 2009, and ended on December 14, 2009.  In other words, two weeks into the event study, Dr. Thomsen's study showed GOPAC was selling beef for a lower price but GOPAC's sales prices reached the national average on December 14, 2011.  Dr. Thomsen assessed GOPAC's losses from August 31 to December 14 to be $16.3 million (Filing No. 319, at 13).

Dr. Thomsen's expert disclosure contains the following paraphrased opinions:

> 1. During the event window, the average price GOPAC received for its beef products fell beginning with the week of August 31, 2009, and remained lower through the week of December 14, 2009. During the

---

[1] Dr. Thomsen choose to place the beginning of the event window at August 14, 2009, because the *New York Times* reporter was actively researching the Article and received a Freedom of Information Act disclosure from the U.S.D.A. on August 21, 2009. Filing No. 321-12, at 35.

>event window, GOPAC's prices were as much as 14.5% lower than would have been predicted given the behavior of the broader boxed-beef market.
>
>2. As a result of these lower prices, GOPAC experienced economic loss in excess of $16.3 million.
>
>3. Greater Omaha's economic loss of $16.3 million is a conservative estimate.
>
>4. The generally accepted methodology used to measure the decline in GOPAC's beef prices is designed to factor out broader movements in the market for boxed beef.  Dr. Thomsen searched other news stories during the event window and there were no other events that could have caused the magnitude of the price declines that GOPAC experienced.

(Filing No. 319, at 1).

## II.  STANDARD OF REVIEW

This Court must determine whether Dr. Thomsen's specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue.  Fed. R. Evid. 702. Under Rule 702, the Court must consider whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining the reliability of a scientist's methodology, the Court should consider whether a theory or technique can be and has been tested, whether it has been subject to peer review or publication, whether it has known or potential error rates or standards and controls, and whether it has gained general acceptance in the scientific community. *Marmo v. IBP, Inc.*, 360 F. Supp. 2d 1019, 1021 (D. Neb. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  The Advisory Committee Notes to the 2000 Amendments to Rule 702, made in response to the *Daubert* decision, list other factors courts often consider when determining whether expert testimony is sufficiently reliable to be considered by the trier of fact.  Among these are (1) whether the research was conducted independent of the litigation or the opinions were developed expressly for purposes of the litigation, (2) whether the expert has extrapolated from an accepted practice to an unfounded conclusion, leaving an analytical gap, (3) whether the expert has adequately accounted for alternative explanations, at a minimum ruling out the most obvious alternative causes, (4) whether the expert has employed the same level of care and intellectual rigor in reaching the opinion as the expert would employ when working outside the courtroom in the expert's field of expertise, and (5)

whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert is offering.  *Id.*

The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592-93, n.10.  "[T]estimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).  "When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## III. DISCUSSION

Cargill proffers several points of opposition to Dr. Thomsen's expert opinions generally.  Though the Court has considered all of Cargill's arguments, it will address those arguments which merit discussion.

First, Cargill asserts Dr. Thomsen's expert opinion is inadmissable because it is not an opinion of damages.  Filing No. 217, at 6.  Cargill cites the Tort's Restatement on Damages for Tortious Interference to conclude that, because GOPAC offered Dr. Thomsen no evidence of contracts, his opinion lacks any calculation of damages.  However, this analysis ignores the

remainder of the Restatement as well as Tortious Interference case law.  *See* Restatement (Second) Torts, § 774A(b), (c) (1979); Filing No. 319, at 20-23 (citing *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243 (S.D. 1999)).

Next, Cargill complains that Dr. Thomsen's analysis does not sufficiently examine alternatives for causes for economic loss.  Both parties have meritorious arguments in this matter.  However, the Court finds that GOPAC has met its burdens.

The Court makes the following findings regarding the *Daubert* elements.  First, Dr. Thomsen's testimony is based upon sufficient facts or data.  Dr. Thomsen only became aware of the earliest possibilities of when the *New York Times* reporter might have disseminated Mr. Stevens's allegations after he rendered his analysis; however, the information Dr. Thomsen possessed at the time of his analysis was sufficient to determine causal relation. *See* Filing No. 321-12, at 35-37.  Dr. Thomsen's causal relation analysis was based upon elimination of the "null hypothesis." Dr. Thomsen eliminated this hypothesis in part by conducting dozens of event studies similar to the August 2009 - December 2009 event study.  Dr. Thomsen compared the abnormal prices (difference between national and GOPAC boxed-beef prices) in those event studies to the primary event study.  Dr. Thomsen discovered that the primary event study ranked 14th out of the

189 event studies, which meant only 8.9% of the event studies had greater disparity between national and GOPAC prices.  Filing No. 321.

Second, Dr. Thomsen's testimony is the product of reliable principles and methods.  The Court finds that Dr. Thomsen's studies $R^2$ value and P-Value methodically and procedurally sufficient.

Third, Dr. Thomsen applied the principles and methods reliably to the facts of the case.

In accordance with the notes of Rule 702, the Court finds (1) Dr. Thomsen developed his opinion expressly for purposes of the litigation, (2) Dr. Thomsen has extrapolated conclusions from an accepted practice, (3) Dr. Thomsen has, at the minimum, accounted for the most obvious alternative cause, chance, in his report, and (4) Dr. Thomsen employed the same level of care and intellectual rigor in reaching the opinion as the expert would employ when working outside the courtroom in the expert's field of expertise, (5) regressive event studies have reached reliable conclusions in economic studies, which is at least relevant in this food-product contract case.

IT IS ORDERED that plaintiff Cargill's motion to exclude the testimony and report of Dr. Thomsen is denied.

DATED this 2nd day of April, 2014.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court