IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

```
AMERICAN HOME ASSURANCE      )
COMPANY and CARGILL MEAT     )
SOLUTIONS CORPORATION,       )
                             )
          Plaintiffs,        )         8:11CV270
                             )
     v.                      )
                             )
GREATER OMAHA PACKING COMPANY,)        MEMORANDUM AND ORDER
INC.,                        )
                             )
          Defendant.         )
_____)
```

This matter is before the Court on defendant's motion in limine (*Daubert*) to exclude testimony of plaintiffs' expert witnesses Siemens, Marsden, Harrison, Singer, and Melnick (Filing No. 277) filed by the defendant. The defendant filed an accompanying brief (Filing No. 278) and indices of evidence (Filing Nos. 282, 284, 285, 286 and 287). The plaintiff filed a responsive brief (Filing No. 328) and index of evidence (Filing No. 329).

I.   BACKGROUND

An *E. coli* outbreak occurred in 2007 and gravely injured several people. An investigation traced the *E. coli* back to a ground-beef patty manufacturer, Cargill Meat Solutions, Corp. ("Cargill"), who is the plaintiff in this case along with American Home Assurance Company ("Assurance"). The plaintiffs

have brought various contract claims against the defendant, Greater Omaha Packing, Corp. ("GOPAC").  Essentially, the plaintiffs claim that GOPAC sold Cargill meat contaminated with the *E. coli* strain in violation of a contract between GOPAC and Cargill.

Cargill used four sources of beef to produce the ground beef patties in question.  Those sources were Lone Star Beef Processors, L.P. ("Lone Star"), Beef Products, Inc. ("BPI"), Frigorifico PUL ("Frigorifico"),[1] and GOPAC.  After production, Cargill distributed the patties across the United States.  In the Fall of 2007, multiple people became ill due to *E. coli* O157:H7 (Filing Nos. 328, at 1; 278, at 3).  The Center for Disease Control ("CDC") began to track the illness.  The CDC compiled a "Line List" which comprised 54 persons affected by the *E. coli* outbreak.  After identifying the 54 people affected by the *E. coli* strain, the CDC found that 27 of them reported exposure to Cargill's burgers (Filing No. 278, at 4).  Cargill recalled approximately 845,000 pounds of product and has settled numerous claims against it with those injured by the contaminated meat.

With 27 of the 54 patients attributed to Cargill's meat, Cargill undertook an epidemiological traceback

---

[1] Frigorifico is a Uruguayan company (Filing No. 278, at 3).

investigation of the remaining 27 patients who did not come into contact with Cargill's meat so that Cargill might isolate which of the four producers may have provided contaminated meat. According to the parties, there are two aspects of an epidemiological investigation involving the traceback to the source of a food borne illness outbreak: (1) the "genetics of the organisms that are causing the disease" and (2) applied epidemiology, which focuses on determining the potential source of the pathogen (Filing No. 328, at 4).  Once a genetic link is observed, the investigators determine whether there is a common source and then determine the common source.  This is done by reviewing whether the persons expressing the same pathogen and sickness share a common source.  The object of an epidemiological investigation is to determine exposure to a common source.

There are two molecular tests often used in foodborne illness molecular epidemiology:  Pulsed Field Gel Electrophoresis ("PFGE") and Multiple Loci VNTR Analysis ("MLVA").  PFGE determines the genetic relatedness of isolated bacteria (*Id.*). MLVA determines whether "bugs" are related by looking for short sequences of nucleotide chains (*Id.*).

Drs. Randall Singer, Lee Harrison, Alan Melnick, James Marsden, and Angela Siemens (collectively, the "Expert

Witnesses") released the following paraphrased opinions in their expert disclosures:

> 1. GOPAC's raw beef trim caused the alleged *E. coli* and that individuals appearing on the CDC Line List were exposed to *E. coli* from GOPAC products;
>
> 2. GOPAC's raw beef trim sold to Cargill was contaminated with *E. coli*;
>
> 3. The beef products supplied to Cargill by other suppliers (BPI, Lone Star, and Frigorifico) to make the American Chef Burgers were not adulterated with *E. coli*;
>
> 4. The patient in Hawaii fell ill due to *E. coli* as a result of consuming product manufactured and sold by GOPAC;
>
> 5. The patient in Missouri fell ill due to *E. coli* as a result of consuming product manufactured and sold by GOPAC;
>
> 6. The patient in Essex County, New York, fell ill due to *E. coli* as a result of consuming product manufactured and sold by GOPAC; and
>
> 7. USDA Non-compliance Reports support a conclusion that GOPAC supplied raw beef trim to Cargill that was contaminated with *E. coli*.

(Filing No. 277, at 1-3).

**II.   STANDARD OF REVIEW**

This Court must determine whether the Expert Witnesses' specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue.  Fed. R. Evid. 702.  Under Rule 702, the Court must consider whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining the reliability of a scientist's methodology, the Court should consider whether a theory or technique can be and has been tested, whether it has been subject to peer review or publication, whether it has known or potential error rates or standards and controls, and whether it has gained general acceptance in the scientific community.  *Marmo v. IBP, Inc.*, 360 F. Supp. 2d 1019, 1021 (D. Neb. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  The Advisory Committee Notes to the 2000 Amendments to Rule 702, made in response to the *Daubert* decision, list other factors courts often consider when determining whether expert testimony is sufficiently reliable to be considered by the trier of fact.  Among these are (1) whether the research was conducted

independent of the litigation or the opinions were developed expressly for purposes of the litigation, (2) whether the expert has extrapolated from an accepted practice to an unfounded conclusion, leaving an analytical gap, (3) whether the expert has adequately accounted for alternative explanations, at a minimum ruling out the most obvious alternative causes, (4) whether the expert has employed the same level of care and intellectual rigor in reaching the opinion as the expert would employ when working outside the courtroom in the expert's field of expertise, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert is offering. *Id.*

The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592-93, n.10. "[T]estimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). "When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**III. DISCUSSION**

GOPAC offers four broad reasons why the Expert Witnesses should be excluded. First, Cargill ignored Lone Star, BPI, and Frigorifico as potential sources of contamination. Filing No. 278, at 13. Second, Cargill ignored 24 out of the 27 CDC Line List patients. *Id.* at 14. Third, the Expert Witnesses have no knowledge of how patients in Hawaii, Missouri, and New York became ill. *Id.* Fourth, Cargill cannot connect the three patients in question to GOPAC. *Id.*

First, GOPAC makes strong assertions regarding Cargill's investigation of other suppliers. In its brief, GOPAC makes bare assertions that the Expert Witnesses skipped essential steps and leapt to the immediate conclusion that GOPAC was the culprit without exhaustively considering the other three sources of Cargill's burgers. *Id.* at 15. GOPAC supports its position by quoting Dr. Singer's deposition in which he stated he "did not believe" he had any records from the other three sources of meat. Also, GOPAC focused on Dr. Harrison's inability to articulate the kind of beef which the other sources delivered to Cargill.

However, Dr. Singer claims his epidemiological traceback isolated GOPAC as the source of the bacteria. Cargill asserts that its experts only reviewed GOPAC's records after they had narrowed the supply chains to GOPAC. Filing No. 328, at 9.

Also, Cargill asserts that the kind of analysis the Expert Witnesses undertook does not require any knowledge of the kind of product that was in question, but rather, whether that product was implicated in the outbreak. Cargill asserts that its investigation was thorough and led to only a single possible source of the bacteria: GOPAC.

Second and similarly, GOPAC makes strong assertions regarding the Expert Witnesses evaluation of 24 patients. As stated above, 54 people became ill from the same strain of *e coli*. Half of those people, 27, were linked to the Cargill burgers, which left 27 patients with unaccounted illnesses. Of those 27 people, Cargill asserts that the traceback connected GOPAC with three of them. Because Cargill produced no connection between GOPAC and the other 24 patients, GOPAC claims Cargill must have ignored them and GOPAC wishes to exclude the Expert Witnesses.

Cargill asserts its experts did not speculate as to cause of any patient's illness and that its experts considered every patient. Filing No. 328, at 11. Cargill could not account for every patient's source of illness. However, Cargill accounts for three of those patients. It does not follow that the Expert Witnesses ignored facts because they failed to account for each patient's illness through analysis. GOPAC's additional arguments

at best focus on the weight the jury should afford an expert witness and the Court will allow Cargill's Expert Witnesses to testify.

Third, GOPAC claims that the Expert Witnesses have no evidence to support their assumptions how the Hawaii, Missouri, and New York patient became ill. GOPAC argues that holes exist that cast doubt on the Expert Witnesses' conclusions, such as the lack of complete food histories for the patients.

Cargill points to various facts which the Expert Witnesses reviewed, including the illnesses of the Line List patients, the patients' food histories, and the existence of products from one of Cargill's suppliers in relation to each patient's food history. Filing No. 328, at 15-16. Evidence exists which supports an epidemiologist's conclusion that GOPAC's products correlated with the three patients' illness.

Finally, GOPAC claims that Cargill cannot prove the three patients were "actually exposed" to GOPAC products. However, the Expert Witnesses utilized epidemiological studies to determine the source of their illness. GOPAC offers several arguments to challenge the Expert Witnesses' conclusions based on the facts, but these arguments will best be used at trial.

The Court finds that the Expert Witnesses' specialized knowledge will assist the trier of fact to understand evidence and to determine facts in issue.

IT IS ORDERED that the defendant's motion (Filing No. 277) is denied.

DATED this 16th day of April, 2014.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court